# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### November 9, 2010 Session

## STATE OF TENNESSEE v. MARCUS D. BELL

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 40900011      Michael R. Jones, Judge**

**No. M2010-00184-CCA-R3-CD - Filed May 11, 2011**

The defendant, Marcus D. Bell, was convicted by a Montgomery County Circuit Court jury of two counts of possession of a firearm by a person previously convicted of a felony drug offense, a Class E felony, and was sentenced to concurrent terms of four years as a Range II offender, to be served consecutively to the defendant's prior sentences in the Department of Correction. On appeal, he argues that the evidence was insufficient to sustain his convictions. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

R. Lance Miller, Clarksville, Tennessee, for the appellant, Marcus D. Bell.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Steven L. Garrett, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant was indicted on three counts of possession of a firearm by a person previously convicted of a felony drug offense, stemming from his apprehension in an area where a Taurus .38 revolver, a SKS assault rifle, and a Mossberg shotgun were found by officers following the officers' pursuit of a "shadowy figure."

**State's Proof**

Agent Lon Chaney with the Major Crimes Division of the Clarksville Police Department testified that he was working on October 11, 2008, at approximately 8:00 p.m. when a phone call came in with information that "subjects were arming themselves" on Oak Lane. Agent Chaney and other officers "caravanned" to the area in several vehicles and parked in front of 912 Oak Lane. Agent Chaney was riding with Sergeant Burt Clinard, another major crimes officer.

Agent Chaney testified that there were approximately ten major crimes officers as well as patrol officers at the scene. As Agent Chaney exited his car, he heard "a gunshot crack through the air" and looked to his right where he "saw a shadowy figure running from right [where] [he] heard the gunshot to behind the building behind [9]12 Oak Lane." The gunshot sounded like a rifle round, and Agent Chaney estimated that he was twenty to thirty-five feet from the location of the gunshot. Agent Chaney said that the area where he heard the shot was dark, but he only saw the one person in the area.

Agent Chaney ducked after hearing the shot and then ran to the front of the house at 912 Oak Lane where he saw the person "coming from the outside of [9]12 on the back end" and hopping over the fence into the yard of 910 Oak Lane. As the person hopped the fence, Agent Chaney "ca[ught] some light" and could see that the person was a black male in all black clothing with "some light reflecting off the neck area." As Agent Chaney was radioing the information, he saw the person jump another fence and then jump "the back side of [9]10 Oak Lane and r[u]n along the hedge row of trees." Agent Chaney was on the other side of the hedge row, and when he found a clearing, "the subject was gone." Agent Chaney called in to get "a quick perimeter on the area" and within ten to fifteen seconds of calling out the pursuit over the radio, patrol officers and other agents "converged on the area."

Agent Chaney said that the person who ran from 912 Oak Lane had been on the left side of the house when he started running. On the left side of the house was "the porch area where everyone had apparently been sitting." The porch was concrete with steps leading up to a side door into a kitchen. There were two chairs on the porch, a beer bottle, and two cell phones lying in front of the chairs. One of the cell phones was a "black AT&T cell phone [and] the other was a maroon, reddish Blackberry."

As soon as the perimeter had been set up, Agent Chaney got a call over the radio that Sergeant Durham had a subject, later identified as the defendant, in custody on Daniel Street, at Delbra Berrios Petty's house. When he arrived, the defendant had already been placed in a patrol car. The defendant's clothing matched that of the person Agent Chaney had been

following, and the defendant also "had a thick gold chain around his neck." Agent Chaney advised Sergeant Durham to transport the defendant to the major crimes office.

Agent Chaney returned to 912 Oak Lane where he found a SKS rifle on the ground near the corner of the house "where [he] first saw the figure run." The officers found a "pistol grip" Mossberg tactical shotgun, partially hidden by a cooler, between the yards of 912 and 914 Oak Lane as well as a loaded .38 Taurus pistol and a phone card in the mailbox of the residence. "[A]t the back side of the fence where [he] saw the person turn and jump in the back side in that wood line[,] [the officers] located a blue duffel bag" containing "ammunition to various types of guns, magazine clips and another cell phone." The SKS rifle was on the back side of the porch within three feet of where Agent Chaney saw the "shadowy figure." The gun was loaded, with a round "racked into the chamber." No cartridge casings from the rifle were found in the area.

Agent Chaney oversaw the collection and photographing of the evidence and then returned to the office to interview the defendant. Agent Chaney asked the defendant about the cell phones they had found, and the defendant responded that "he had given his phone and Alto Parnell's phone to another guy" whom he did not name. The defendant claimed that the phones were not his, but Agent Chaney said that he never told the defendant "exactly what types of phones [they had] located." The defendant claimed "that he was never there."

Agent Chaney searched the defendant and found a receipt for an AT&T cell phone "where you put minutes onto a prepay cellphone." Agent Chaney asked the defendant what he had been doing on Petty's porch, and the defendant explained that Petty "was having problems with drug addicts stealing her pots and plants" so he had been moving them from her open garage to her porch and watering them for her. He said that Petty did not know about his activities – "[h]e thought he'd be nice and do it for her." The defendant explained that the reason he was sweating heavily on "a good fall night" was because he had been moving the plants from the garage to the porch.

When the defendant questioned whether Agent Chaney had any evidence against him, Agent Chaney explained that he had observed someone dressed exactly like him, to which the defendant responded that he "ha[d] three, four people that dress like [him] to go around the area to see if anybody starts any trouble with [him]." Asked whether the defendant was questioned about the weapons found in the area, Agent Chaney stated, "We delved into that but he just denied ever being there, so it was pointless." The defendant told him that he would "find guns hidden all over the place" if he looked around "what [the defendant] called the project area."

Based on the cell phone receipt found on the defendant, Agent Chaney went to Jordan's Market, a convenience store in the area of the incident, and obtained the store's surveillance video from the day of the incident. The video showed the defendant, dressed in a black shirt, black shorts, and wearing a thick gold chain, purchasing "the phone card receipt with the pin number." Agent Chaney was able to link the receipt to the black AT&T cell phone found at the scene. All of the evidence at the scene was processed for fingerprints, but Agent Chaney did not have any DNA testing done because "[his] department can't afford it." He did not ask for a gunshot residue test of the defendant because "that would just mean within the last 24 hours he probably held a firearm and fired a firearm. And typically when you have a rifle of some type it doesn't leave a lot of trace evidence as far as the gunshot residue."

Agent Chaney's investigation revealed that 912 Oak Lane was a vacant residence and 914 Oak Lane was occupied by the defendant's parents. Agent Chaney believed that the defendant had lived across the street from his parents' house at some point. Agent Chaney identified the maroon AT&T Blackberry and black AT&T Nokia cell phones found in front of the chairs on the porch at 912 Oak Lane, three to five feet from where the SKS assault rifle and Mossberg shotgun were found. Agent Chaney's investigation revealed that the defendant had come into possession of the maroon Blackberry earlier in the day of the incident.

Agent Chaney identified a still photograph taken from the Jordan's Market surveillance video, showing "[the defendant] standing at the front counter at the time he was purchasing the AT&T phone receipt," which was around 2:00 p.m. the day of the incident. Agent Chaney identified the firearms found at the scene and noted that the guns were loaded. He also identified eighteen SKS rounds that were found in the blue duffel bag, along with two empty SKS magazines and various types of ammunition found on the other side of the fence of 910 Oak Lane, which was the route taken by the "shadowy figure" Agent Chaney followed.

Agent Chaney identified a satellite photograph of the area and showed where the duffle bag was found, which was between 912 Oak Lane and Petty's house. He described on the photograph the area where he heard the gunshot and the route he took chasing the "shadowy figure." Agent Chaney estimated that the distance from where he heard the gunshot to Petty's house was approximately seventy-five yards. Agent Chaney later determined that there were other people at 912 Oak Lane who may have also run away, but the only person he saw and chased was the person dressed in black with a gold reflective chain around his neck.

On cross-examination, Agent Chaney admitted that the firearms and other items sent to the Tennessee Bureau of Investigation ("TBI") for fingerprint comparisons did not show any matches to the defendant. Agent Chaney admitted that he did not obtain any gunshot residue on the defendant and that there was no evidence that the SKS assault rifle had been fired. Agent Chaney said that the gunshot he heard sounded like it came from a rifle, not a shotgun or pistol.

Agent Chaney stated that there was a total of fifteen to twenty officers within "a tenth of a mile, two tenths of a mile of the location" and that many of those officers were already in the area "working on other things that had been going on the day prior." Agent Chaney admitted that there were several people in the neighborhood who fit the defendant's general description and that it was not uncommon for someone the defendant's age to wear a gold chain. Agent Chaney acknowledged that he lost contact of the "shadowy figure" he was chasing and that another officer took the defendant into custody. Agent Chaney acknowledged that the surveillance video of the defendant in Jordan's Market did not actually show what the defendant received at the counter. Agent Chaney testified that he spoke with the defendant's parents after the incident, and the defendant's mother said that the defendant and two of his friends were in the area that evening. On redirect examination, Agent Chaney elaborated that the defendant's mother said that the defendant and his two friends "were just hanging out over there, and . . . when the police pulled up they took off running.

Agent Steven Hamilton with the Major Crimes Division of the Clarksville Police Department testified that he had known the defendant "[a] few years" at the time of the incident. During the early afternoon hours, sometime between 11:00 a.m. and 1:00 p.m., of October 11, 2008, Agent Hamilton and Agent Williamson were parked between 912 and 914 Oak Lane, speaking with the defendant and a man named Alto Parnell. During the conversation, Agent Hamilton saw Parnell hand the defendant a red or maroon Blackberry phone, and the defendant took possession of it. Parnell then went voluntarily with the officers to the major crimes office for questioning regarding another case. At trial, Agent Hamilton was shown a red Blackberry and identified it as the phone he saw Parnell give the defendant on October 11.

On cross-examination, Agent Hamilton admitted that he did not check the serial number on the phone Parnell handed to the defendant and that a Blackberry was a common phone. Agent Hamilton further admitted that multiple copies of a similar-looking phone can be produced and that it was possible the defendant had more than one maroon Blackberry phone.

Agent Joey Williamson with the Major Crimes Division of the Clarksville Police Department testified that he and Agent Hamilton saw the defendant in the street near 910 and 912 Oak Lane during the early afternoon hours of October 11, 2008. Agent Williamson saw Alto Parnell give the defendant a red phone. Shown the red phone that was an exhibit in this case, Agent Williamson said that "when [he] was with [the defendant] and Alto [Parnell], Alto [Parnell] pulled that phone out of his pocket and gave it to [the defendant]." Parnell then went voluntarily with the officers to the major crimes office. On cross-examination, Agent Williamson admitted that he did not check the serial number on the phone Parnell handed to the defendant and that one could have any number of phones that looked very similar.

Agent Frederick McClintock with the Major Crimes Division of the Clarksville Police Department testified that he was in the neighborhood of Oak Lane and Daniel Street around 8:00 p.m. the evening of October 11, 2008 to assist other agents in "trying to apprehend an individual or individuals that ran on foot from the area of Oak Lane." Agent McClintock stated that he parked his patrol car on Oak Lane and assisted in setting up a perimeter in the area of 900 Oak Lane to search for suspects. During his search, Agent McClintock found a Warrior .357 caliber pistol in some plastic bags in a wood line approximately three houses away from 912 Oak Lane.

Agent McClintock stated that he was then called to inventory and collect a blue duffel sports bag that had been found by other officers. Agent McClintock noted that there were several rounds of ammunition in the bag. Agent McClintock then went to the area of 912 and 914 Oak Lane to inventory and collect more evidence found by other officers. The items included a Taurus revolver inside the mailbox at 912 Oak Lane and, in the area near the porch, a SKS rifle, two cell phones, and a beer bottle. The cell phones, a maroon Blackberry, and a black cell phone, were found approximately ten to fifteen feet apart on the sidewalk near the porch of 912 Oak Lane. The SKS rifle was found on the back side of the small porch of 912 Oak Lane. A shotgun was found under a cooler in the yard of 914 Oak Lane next to a fence separating the property from 912 Oak Lane.

On cross-examination, Agent McClintock testified that he was involved in the fingerprinting of the rifle, shotgun, and Taurus handgun, as well as the cell phones. He was aware that there were no results or matches from the fingerprint testing. Agent McClintock said that he "spoke to at least two of the residents at [9]14 [Oak Lane] in reference to the taking of the pictures and recovering the evidence."

The State recalled Agent Chaney who testified that after the black cell phone was "fumed" for fingerprints, he turned it on to identify the number to the phone. During the subsequent weeks, Agent Chaney checked the telephones of people arrested in the area or

known associates of the defendant to look for that phone number "listed in the contacts." Agent Chaney said that he was successful in finding the number listed under the defendant's first or last name or under his street name, "M-B." Agent Chaney followed a similar procedure with the maroon Blackberry and found Alto Parnell, who went by "Al, Al pistol, or pistol," in the contact information "of people that [they] had in [their] custody throughout the subsequent weeks." Agent Chaney acknowledged that other people were involved in this criminal episode, but the defendant never disclosed who those people were or who was with him that evening. On cross-examination, Agent Chaney said that no one else was apprehended that evening, and he "d[id]n't believe that the shadowy figure was not [the defendant]."

Dabney Kirk, a special agent and forensic scientist with the TBI, testified that she examined the guns, cell phones, and other items for latent fingerprints but found no latent prints that matched the defendant. Kirk explained that items that are handled a lot tend to not have identifiable fingerprints. She said that it was difficult to "find very many prints on weapons just because of the way they're handled, and the amount of area that you don't really handle them in a lot of the places that are not textured." She was able to lift identifiable prints from a beer bottle, some paper cartridge holders, and a phone card, and those prints did not match the defendant or anyone else in the fingerprint database.

Kevin Warner, a special agent and forensic scientist with the TBI, testified that he examined the SKS rifle, the shotgun, and Taurus pistol in this case and determined that all three firearms were functional.

Sergeant Robert Durham with the Clarksville Police Department Patrol Division testified that he responded as backup around 8:00 p.m. on October 11, 2008, to a call that officers with the major crimes division were involved in a foot pursuit of an armed individual. During his canvass of the area, Sergeant Durham spotted an individual matching the description of the individual sitting on a wooden deck attached to a house on Lucas Lane in the area of Daniel Street.

Sergeant Durham approached the individual and noticed that "he was sweating profusely; very, very heavily sweating." Sergeant Durham asked the individual for identification, and "he gave [him] a photo I-D card with [the] name of [the defendant] on it." In response to Sergeant Durham's inquiry as to where he had been, the defendant responded that he had been on "Oak Lane a few moments prior." When Sergeant Durham "[a]sked [the defendant] what he was doing at the residence[,] he said it was [a] relative's house and that he took care of the plants." Sergeant Durham asked the defendant why he was sweating so much, and the defendant responded that "he sweat[ed] a lot when he was dressed in all black clothing." Sergeant Durham knocked on the doors and windows of the

house to see if anyone answered, but no one answered and there were no cars in the driveway.

Sergeant Durham testified that two other officers arrived, and he asked them to detain the defendant "pending further investigation." A member of the major crimes division identified the defendant and asked that he be transported to the major crimes office. Sergeant Durham recalled that the defendant was wearing a black shirt and pants and had a gold chain around his neck.

On cross-examination, Sergeant Durham recalled that "there were some remnants of what might have been plants on the deck" of the house where the defendant was found sitting.

Delbra Berrios-Petty testified that she lived at 1234 Daniel Street, "about a half a block from Oak Lane." Petty said that she had lived in the neighborhood for twenty years and had known the defendant approximately ten years. She said that she had never asked the defendant to take care of her potted plants but said that "[i]t was just common knowledge that most of the young men keep an eye on [her] house, because [she is] in and out of town on business . . . and they just look after [her] house." The defendant was among the young men who "gr[e]w up with [her] children" and looked after her house. She said that, to her knowledge, the defendant lived with his mother on Oak Lane at the time of the incident.

Petty testified that she arrived home around 9:00 p.m. on October 11, 2008, to discover police cars in her driveway and several officers in the area. One of the officers asked if she knew the defendant, to which she responded that she did. The officer also mentioned "something about [her] plants ha[ving] been moved." Petty stated that she would not have known whether her plants had been moved because she had not been home "since Friday evening," but she did not believe that they had been moved. She did not check inside her garage because it was dark, but her plants were on the deck where she normally kept them. Petty said that her son, Charles, was a good friend of the defendant "[a]s far as [she] kn[e]w."

On cross-examination, Petty testified that she had talked to the defendant "a few times" and that "[h]e [had] done a few little things for [her]." The defendant would speak to her or wave to her if he saw her sitting outside. Petty said that it was not uncommon for young men in her neighborhood to wear chains around their necks and that there were a lot of people matching the defendant's general description who lived in the neighborhood. Petty stated that she did the majority of her own yard work and that she would have thought it unusual if she came home and found the defendant sitting on her deck.

Agent Greg Beebe with the Major Crimes Division of the Clarksville Police Department testified that he spoke with Petty the evening of October 11, 2008. Agent Beebe asked Petty if she knew the defendant, and Petty said she did not. Agent Beebe also asked Petty who did her yard work, and she said that she did her own yard work except a Mr. Williams trimmed her hedges. Petty told Agent Beebe that she took care of all of her plants and that nothing had been moved on her porch. He said that there were "a few plants" on Petty's porch, and he did not look in her garage. Agent Beebe asked Petty if there was anyone at her house earlier that evening, and "she stated no, she lives alone." Agent Beebe observed that the plants on Petty's porch "were in pots, and there was a bunch of dead leaves around the pots on the porch."

## Defendant's Proof

Dennis Smith, the defendant's father, testified that at the time of the incident he was living at 914 Oak Lane. The defendant was not living with him at the time, but he visited once or twice a week. Smith stated that "[he] may have seen [the defendant] . . . sometime [the] day" of the incident, recalling that he "was driving a cab and came through and s[aw] him then." He recalled that the defendant was with two to four of his friends.

Smith stated that he got off work at 5:00 p.m. and relaxed on his front porch. He did not think that anyone lived in the house next-door at 912 Oak Lane. However, there was "a bunch of people out there on the street," many who were approximately the defendant's age. Smith noted that it was not uncommon for people to wear dark clothes or a chain necklace. As he was sitting on the porch, Smith noticed police officers in the neighborhood, "searching yards and all around houses and everything." After about an hour or an hour and a half of searching, an officer approached Smith and told him that there was "a shotgun over at this beer cooler; [and] [Smith] said no, there ain't nothing in that cooler but a bag of charcoal. So [the officer] brought it to [him], showed [him], and there was a shotgun right there beside the cooler." The cooler was in Smith's yard. The officer also showed Smith a pistol in the mailbox of 912 Oak Lane. Smith said that the officers were already in the area when he arrived home at approximately 5:20 p.m.

On cross-examination, Smith said that the defendant went by the nickname of "M-B." He said that he did not hear a gunshot or anything of that nature the night of the incident. Smith acknowledged that even though the cooler was sitting next to the fence on his property at 914 Oak Lane, the shotgun was within reaching distance of someone from the 912 Oak Lane side of the fence. Smith stated that the defendant did not live with him and the defendant's mother at the time, but he had stayed with them when they lived at 917 Oak Lane.

Dorothy Bell, the defendant's mother, testified that in October 2008, she and Smith were living at 914 Oak Lane. The defendant was not living with them, but he "c[a]me by every day[, typically with] . . . a whole lot of friends." On October 11, the defendant came to her house that morning and "stayed with [her] all day . . . [u]p [until] the evening. Before it got dark." The defendant was "in and out" all day and had approximately four friends with him. The defendant and his friends were all wearing dark clothes. Bell observed that "[t]here were a whole lot of [people]," young men, hanging around 912 Oak Lane and "[a]ll the way down the street and across the street." Bell did not observe the defendant with a firearm at any time that day.

Bell testified that she spoke to the police early that morning, before the defendant arrived, regarding "some little men surrounded down [on] the corner" of Oak Lane and Daniel Street in an unrelated incident. She told the police that she had seen some men who "took off running." She said that she "[p]robably" talked to the police again later that day because "[t]hey just kept on coming by." The police did not ask her about the defendant, and she did not recall talking to the police later in the evening after this incident.

On cross-examination, Bell testified that the house at 912 Oak Lane was vacant, but people, including the defendant, often hung out there. There were three or four chairs near the porch at that address. Bell did not hear a gunshot that night.

The defendant testified that he was not living with his parents at the time of the incident, but he visited them approximately five times a week because his daughter was there and he stayed for a few hours each time. He also visited with his friends in the neighborhood. The defendant estimated that he arrived in the neighborhood around one or two o'clock in the afternoon the day of the incident, after being released "from the crime unit earlier that day." He elaborated that he had been taken to the crime unit for questioning regarding an "incident that occurred over in Summit Heights." However, "right after [the officers] let [him] go[,] they came back through and they s[aw] [him] . . . then they picked up Alto Parnell."

The defendant stated that he then went to talk to his mother until 5:30 or 6:00 p.m. when he went with a "lady friend" to have dinner. Later on, he went to another friend's house at 905 Lucas Lane and then walked down Daniel Street. As he walked, the defendant noticed that Petty's plants were by her driveway. Thinking that her plants were in danger of getting stolen sitting at the end of the driveway, he "grabbed her plants and put them back on the thing." He heard sirens and saw police cars pass by, then he went and sat on Petty's porch. At that point, "the police backed up and put a light on [him]" and requested his identification. The defendant told the officer that he was at "[his] friend's momma['s] house" and explained that he was moving her potted plants onto the porch where they were

normally located. He said that he "was sweating a little bit putting them plants on there." He admitted that it was uncommon for him to be at Petty's house with her not home, but he thought he would be considerate and "just put the plants back[.]"

The defendant testified that he did not hear any gunshots that evening, although the previous night "[i]t was like 100 rounds let off over there in the street." The defendant denied having any knowledge of the firearms that were found. The defendant said that he was taken into custody because "[the officer] said [he] fit a description." He did not recall what his friends were wearing that day but said that they had "the similar type taste" and wore gold chain necklaces every day.

On cross-examination, the defendant admitted that Alto Parnell handed him a maroon Blackberry cell phone in the presence of major crimes officers earlier the day of the incident, after he had been to Jordan's Market where he bought, among other things, a cell phone card. He admitted that he had two other cell phones, a black and gray phone and a black phone, in addition to the phone Parnell handed him. The defendant acknowledged that he was wearing the same clothes at Jordan's Market as he was wearing when he was arrested later that evening. He admitted that his nickname was "M-B." However, he said that there were three people called "M-B" – "[o]ne from Greenwood, one from [his] way and one from New Providence." The defendant denied "[h]anging out" at 912 Oak Lane, explaining that he and his friends "hangout [sic] in the street" in front of the house.

At the conclusion of the proof, the jury convicted the defendant of possession of a firearm by a person previously convicted of a felony drug offense with regard to the SKS assault rifle and Mossberg shotgun but not the Taurus .38 revolver.

## ANALYSIS

The defendant challenges the sufficiency of the convicting evidence, arguing that the evidence was entirely circumstantial and did not exclude every reasonable hypothesis except that of his guilt.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600,

604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the direct and circumstantial evidence, and all factual issues are resolved by the trier of fact. See id.; State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Tennessee Code Annotated section 39-17-1307 provides, in pertinent part: "A person commits an offense who possesses a firearm, as defined in § 39-11-106, and . . . [h]as been convicted of a felony drug offense." Id. § 39-17-1307(b)(1)(B). The defendant does not dispute his status as one previously convicted of a felony drug offense. He only contests the sufficiency of the circumstantial evidence of his constructive possession of the firearms.

In the light most favorable to the State, the evidence shows that several officers went to a Clarksville neighborhood in response to a call that "subjects were arming themselves."

-12-

As he was getting out of his car at 912 Oak Lane, Agent Chaney heard a rifle shot and saw a "shadowy figure" run from the side of the house where the shot came from around the back of the house. Agent Chaney started chasing the person and "ca[ught] some light" as the person hopped a fence, allowing Agent Chaney to see that the person was a black male in all black clothing with "some light reflecting off the neck area." Agent Chaney lost sight of the person but, soon after radioing a description, was informed that a subject matching the description was in custody nearby.

Agent Chaney went to the address where the defendant, sweating profusely, had been found on Delbra Petty's porch. The defendant claimed to be sweating because he was dressed in black clothing and had been moving Petty's plants from her driveway to the porch for her. He admitted that he was moving Petty's plants, however, without her knowledge. When Petty arrived home later that evening, she told Agent Beebe that she did not know the man who was arrested at her home and said that no one helped take care of her plants. Petty told the jury that she knew the defendant and that he looked out for her house when she was away, as did the other young men in the neighborhood. However, she had not asked the defendant to take care of her plants, and she would have been surprised to come home and find the defendant sitting on her porch. She could not tell if her plants had been moved, but they were where she normally kept them.

When Agent Chaney returned to the residence at 912 Oak Lane, he and other officers found a SKS assault rifle on the ground near the corner of the house where he first saw the shadowy figure run. They also found a "pistol grip" Mossberg tactical shotgun, partially hidden by a cooler, on the other side of a low fence separating 912 Oak Lane from 914 Oak Lane, where the defendant's parents lived, within easy reach of someone standing on the 912 side of the fence. The officers found a blue duffel bag that contained, among other things, ammunition for various types of guns along the route Agent Chaney chased the shadowy figure.

Two cell phones, a maroon Blackberry and a black AT&T phone, were found in front of the chairs on the porch at 912 Oak Lane, three to five feet from where the SKS assault rifle and Mossberg shotgun were found. Earlier in the day of the incident, Alto Parnell was seen handing the defendant a maroon Blackberry before Parnell was taken to the police station for an interview. Also, Agent Chaney determined that the defendant, wearing black clothing and a gold chain necklace, bought minutes at a nearby store earlier in the day of the incident for the black AT&T phone that was found on the porch. In the telephone contact list of people associated with the defendant, Agent Chaney found the phone number for the black AT&T phone listed under the defendant's name or nickname and the phone number for the maroon Blackberry listed under Parnell's name or nickname. Although the defendant claimed that he had given both phones to someone, he would not disclose the name of the

person. The defendant's mother told Agent Chaney that the defendant and two of his friends were at 912 Oak Lane the evening of the incident, but they ran when the police arrived.

This evidence, in the light most favorable to the State, while entirely circumstantial, was consistent with the guilt of the defendant. The jury heard the defendant's reasons for being present on Petty's porch and his denial of knowing the whereabouts of the cell phones and rejected his testimony, as was its prerogative. Upon rejecting his explanation, the only logical conclusion was that the defendant fled from a stash of weapons and was quickly entrapped by the convergence of officers on the area. The circumstantial evidence in this case was sufficient for a rational trier fo fact to find the defendant guilty beyond a reasonable doubt. See Dorantes, 331 S.W.3d at 381.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE